**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ALEXANDER CAMERON et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 21-cv-2908 (APM) |
| DISTRICT OF COLUMBIA, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In August 2020, the D.C. Metropolitan Police Department ("MPD") arrested Plaintiffs Alexander Cameron, Benjamin Tan, Destiny Robinson, Jonah Angeles, and Jake Oster, along with dozens of others, for alleged felony rioting in connection with the protests for racial justice following the murder of George Floyd.  Upon their arrests, MPD seized Plaintiffs' cell phones. No Plaintiff was charged, however.  Notwithstanding their non-prosecution, MPD took months to return the devices to some Plaintiffs.  Others still have not received their property.

Plaintiffs filed this suit against Defendant District of Columbia ("the District") as a putative class action, challenging what they contend is a customary practice by MPD to retain for an unreasonable period of time the cell phones of arrestees not charged with an offense.  Plaintiffs assert claims under 40 U.S.C. § 1983 for violations of both the Fourth and Fifth Amendments and a common law claim for conversion.

The District moves to dismiss.  Finding that Plaintiffs have failed to state claims under Section 1983 and declining to exercise supplemental jurisdiction over Plaintiffs' conversion claim, the court grants the District's motion.

## II.   BACKGROUND

The court begins by summarizing the facts alleged.  The court accepts these allegations as true for purposes of evaluating the motion to dismiss.  *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018).

On August 13, 2020, Plaintiffs joined dozens of people marching "for police reform and racial justice."  Compl., ECF No. 1 [hereinafter Compl.], ¶ 2.  When demonstrators reached the Adams Morgan neighborhood, MPD officers approached and surrounded them in "a confined area, using a tactic known as 'kettling.'"  *Id.* ¶ 3.  MPD arrested all 40-plus demonstrators for alleged felony rioting.  *Id.*; Def.'s Mot. to Dismiss, ECF No. 19 [hereinafter Def.'s Mot], Def.'s Mem. of P. & A. in Supp. of Def.'s Mot., ECF No. 19-1 [hereinafter Def.'s Mem.], at 1.  Plaintiffs and other arrestees were held for up to 36 hours until the U.S. Attorney's Office for the District of Columbia ("USAO") "no-papered" their cases, that is, declined to file formal charges.  Compl. ¶ 3.  Plaintiffs and others then tried to retrieve the personal effects MPD had seized from them at the time of their arrests.  *Id.* ¶ 4.  But MPD refused to release nearly all of the arrestees' cell phones.  *Id.*

Four days later, an attorney for Plaintiffs reached out to the USAO seeking return of the mobile devices and other seized property.  *Id.* ¶ 25.  The USAO directed him to contact MPD instead.  *Id.* ¶ 26.  Counsel then made multiple contacts with MPD officials.  *Id.* ¶ 27.  It took nearly two weeks for him to get a response.  *Id.*  On August 27, 2020, Detective Nicole Copeland informed him in an email that the incident was being "actively investigat[ed]" and that MPD may still seek search warrants for the phones.  *Id.*  Putative class members continued to make calls to

MPD's Evidence Control Division and property clerks at various precincts over the course of many months, but they were unsuccessful in recovering their phones.  *Id.* ¶ 31.

Eventually, some Plaintiffs turned to the courts.  Plaintiffs Cameron, Robinson, and Tan filed motions in D.C. Superior Court for return of their property under D.C Superior Court Rule of Criminal Procedure 41(g).  *Id.* ¶ 32.  That rule provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."  D.C. SUPER. CT. R. CRIM. P. 41(g).  The no-papering of Plaintiffs' cases meant that they were not assigned criminal docket numbers of their own, so they filed their motions in the only active criminal matters relating to the August 13, 2020 demonstrations.  *Id.* ¶ 33.  Court staff informed them that this was error and directed Plaintiffs to re-submit motions under their own captions for each to be evaluated as a "sealed, standalone noncriminal case for administrative purposes."  *Id.* ¶ 34.  Plaintiffs did so on March 18, 2021.  *Id.* ¶ 36.  Soon after, an Assistant U.S. Attorney filed the forms required for the phones' release, but Plaintiffs' counsel did not learn of the filing until May 4, 2021.  *Id.*  Even then, MPD did not return Plaintiff Cameron's phone to him until May 26, 2021, and Plaintiff Tan's phone to him until June 21, 2021.  *Id.* ¶¶ 37–38.  Plaintiff Robinson still had not received her phone at the time of this suit's filing in November 2021.  *Id.* ¶ 40.  Plaintiffs Angeles and Oster did not file return-of-property motions in D.C. Superior Court; despite multiple contacts with MPD, they still have not had their phones returned to them.  *Id.* ¶ 41.  MPD held on to an additional thirty-odd phones of other arrestees for the next fourteen months with no articulated timeline or prospect of eventually returning them.  *Id.* ¶¶ 5–6.

Plaintiffs claim to have suffered financial and emotional harms resulting from MPD's failure to act promptly to return their property.  *Id.* ¶ 85.  Plaintiffs "were forced to replace their phones, and some class members incurred contract and data charges" despite not possessing the

devices.  *Id.* ¶ 43.  Plaintiff Cameron feared that police were using his messages and photos to "attempt[] to monitor protest activity."  *Id.* ¶ 44.  Other Plaintiffs worried MPD would use their devices to "collect information about Black Lives Matter activists."  *Id.* ¶¶ 45, 47–49.  Plaintiffs also lost their ability to access photos, documents, work material, and various electronic accounts secured by two-factor authentication.  *Id.* ¶¶ 43, 46, 47.

Plaintiffs' suit followed on November 4, 2021.  Compl.[1]  They allege the "prolonged retention" of their devices is part of Defendant's "custom of retaining cell phones seized from arrestees, where officers have no basis to believe the" phones either are themselves contraband or can further law enforcement investigatory leads "for longer than is reasonably necessary."  *Id.* ¶ 51.  In their Complaint, Plaintiffs offer other examples of the alleged custom, including the arrests and subsequent seizures of the phones of more than 200 individuals arrested protesting the inauguration of President Donald Trump on January 20, 2017.  *Id.* ¶ 53(a).

## III.   LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, the court must find that the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  And "naked assertion[s] devoid of further factual enhancement" are not sufficient to support a complaint.  *Id.* (alteration in original) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557).  Factual allegations are not required to be "detailed," but pursuant to

---

[1] Plaintiffs filed a motion for class certification the following day, Pls.' Mot. for Class Certification & Appointment of Class Counsel, ECF No. 9, as to which the court stayed briefing, Order, ECF No. 18.

the Federal Rules, they must be more than "an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "Where the well-pleaded facts do not permit

the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it

has not shown—that the pleader is entitled to relief," and the case can be dismissed. *Id.* at 679

(cleaned up) (citing FED. R. CIV. P. 8(a)(2)).

## IV.  DISCUSSION

### A.  Fourth Amendment Claim (Count I)

#### 1.  *Legal Standard*

Plaintiffs' primary claim under Section 1983 is that the District violated their Fourth

Amendment rights through its custom of "unreasonably retain[ing] the[ir] phones for longer than

necessary to serve a legitimate governmental purpose." Compl. ¶ 80. Courts conduct a two-part

test to determine whether a municipality like the District is liable to a plaintiff for a constitutional

violation. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). First, the court

considers "whether the complaint states a claim for a predicate constitutional violation." *Id.* Next,

the court evaluates "whether the complaint states a claim that a custom . . . of the municipality

caused the violation." *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

Plaintiffs must plausibly plead both elements to survive the District's motion to dismiss.

#### 2.  *Plaintiffs' Challenge to the District's Failure to Return Cell Phones*

The court begins with whether Plaintiffs have stated a violation of the Fourth Amendment.

The District says that they have not. Lacking on-point D.C. Circuit precedent, the District relies

on a host of cases from other Circuits that stand for the proposition that the prolonged retention of

property whose initial seizure is lawful "does not sound in the Fourth Amendment." Def.'s Mem.

at 9. Plaintiffs do not quarrel with the District's description of these cases. Plaintiffs instead call

them "outliers." Pls.' Opp'n at 11. According to them, these cases "are not only incompatible with Supreme Court decisions, but also conflict with other opinions within their respective circuits." *Id.*

Plaintiffs' characterization of the state of the law is wrong. Every single Circuit that has either squarely ruled on or briefly considered this issue has found that the prolonged retention of lawfully seized property does not implicate the Fourth Amendment's protection against unreasonable seizures. The cases cited by the District—from the First, Second, Sixth, and Seventh Circuits—are all on point. Def.'s Mem. at 9 & n.4. In *Denault v. Ahern*, the First Circuit held that challenges to "the government's retention of personal property after a lawful initial seizure . . . sound[] in the Fifth Amendment rather than in the Fourth." 857 F.3d 76, 84 (1st Cir. 2017), superseded by rule on other grounds, FED. R. APP. P. 3, as recognized in *Gonpo v. Sonam's Stonewalls & Art, LLC*, 41 F.4th 1, 10 (1st Cir. 2022). The Second Circuit in *Bennett v. Dutchess County* said that "where an initial seizure of property was reasonable, the government's failure to return the items does not state a separate Fourth Amendment claim of unreasonable seizure." 832 F. App'x. 58, 60 (2d Cir. 2020) (cleaned up); *see also Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d. Cir. 2004) ("Where, as in this case, an initial seizure of property was reasonable, [the government's] failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure. . . . To the extent the Constitution affords [a plaintiff] any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process."). In *Fox v. Van Oosterum*, the Sixth Circuit interpreted the word "seizure" in the Fourth Amendment to protect a person's right only in initially retaining property and not any attempt to regain it thereafter. 176 F.3d 342, 349–52 (6th Cir. 1999). The court in *Fox* held that "[o]nce th[e] act of taking the property is complete, the seizure

has ended and the Fourth Amendment no longer applies." *Id.* at 351.  And, the Seventh Circuit in *Lee v. City of Chicago* said that "the text of the amendment . . . suggests a *state of being* that is protected against intrusion by unlawful government action. . . . [O]nce that state has been disturbed by an act of dispossession, the individual is no longer secure in his possessory interest within the meaning of the amendment."  330 F.3d 456, 462 (7th Cir. 2003).  "[A] government's decision regarding how and when to return once lawfully obtained property raises different issues, which the text, history, and judicial interpretations of the Fourth Amendment do not illuminate."  *Id.* (internal quotation marks and citation omitted).

To these authorities the court adds two more.  In *Gilmore v. City of Minneapolis*, a decision from the Eighth Circuit, the plaintiff had alleged that the permanent *destruction*—not mere unreasonable delay in return—of a political sign seized incident to arrest violated the Fourth Amendment.  837 F.3d 827, 838 (8th Cir. 2016).  The court observed that, "if the seizure was valid, we doubt [the plaintiff] can assert a Fourth Amendment claim over the sign's destruction."  *Id.* The Tenth Circuit's decision in *Snider v. Lincoln County Board of County Commissioners* involved a challenge to a years-long retention of seized guns and a concealed weapons permit. 313 F. App'x. 85, 86 (10th Cir. 2008).  The court held that it was error for the trial court to have treated that challenge as "only rais[ing] rights explicitly protected by the Fourth Amendment," explaining that in a prior case the Tenth Circuit had "analyzed the propriety of the initial seizure by police under the Fourth Amendment, but held that the ultimate disposition of the property had to comply with the protections of procedural due process [under the Fifth and Fourteenth Amendments]."  *Id.* at 92–93.  The court noted that "[o]ther circuits have followed the same approach with respect to alleged constitutional violations related to the seizure versus the detention of property." *Id.* at 93 (citing cases from the Second, Seventh, and Eleventh Circuits).

The only court in this District to have addressed this issue was persuaded by these Circuit decisions.  In *In re the Search of Twenty-Six (26) Digital Devices & Mobile Device Extractions That Are Currently in the Possession of Law Enforcement in Washington D.C.* (*In re 26 Digital Devices*), Chief Judge Howell held that the Fourth Amendment did not bar "the government from executing [a new] search warrant to query . . . lawfully seized cell phone data because the extracted data ha[d] been retained in the government's possession for too long."  No. 21-sw-233 (GMH) (BAH), 2022 WL 998896, at *1 (D.D.C. Mar. 14, 2022).  In so holding, she observed that "the majority of circuits to consider the issue have held that '[e]valuating the legitimacy of law enforcement's interests in retaining lawfully seized property and weighing them against an individual's competing interest in *regaining* his property *is not*, *and never has been*, a concern of the Fourth Amendment, even when the underlying investigation or prosecution has been completed.'  *Id.* at *12 (first quoting *Lee*, 330 F.3d at 465; then citing *Shaul*, 363 F.3d at 187; then citing *Denault*, 857 F.3d at 83–84; and then citing *Fox*, 176 F.3d at 349–52).  This is not to say that the government "may indefinitely retain lawfully seized items once a prosecution or investigation has ended without *any* justification," the Chief Judge said.  *Id.*  Rather, "as several of the circuits have held, judicial scrutiny of law enforcement's retention policies for evidence seized lawfully pursuant to a search warrant simply falls outside the purview of the Fourth Amendment."  *Id.*

Plaintiffs respond that every one of these decisions is wrong.  Pls.' Opp'n at 11–17.  Their opposing view rests on a trio of nearly forty-year-old Supreme Court cases.  Pls.' Opp'n at 7–8 (first citing *United States v. Place*, 462 U.S. 696 (1983); then citing *United States v. Jacobsen*, 466 U.S. 109 (1984); and then *Segura v. United States*, 468 U.S. 796 (1984)).  Those cases, they contend, "establish that the Fourth Amendment regulates not only the initial seizure of property

but also its duration." *Id.* at 8.  But these cases stand for an entirely different proposition.  Taken together, they hold that an initial investigatory detention of property, even if valid at the start, can become unreasonable based on the manner of its *execution*, which may include the length of its duration.  So, in *Place*, the Court held that law enforcement's temporary seizure of luggage, comparable to a *Terry* stop of a person, for 90 minutes before a narcotics-detection dog conducted a "sniff test" violated the Fourth Amendment.  462 U.S. at 710.  "The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Id.* at 709.  In *Jacobsen*, the Court described its holding in *Place* as "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its *manner of execution* unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Jacobsen*, 466 U.S. at 124 (emphasis added).  The Court in *Jacobsen* held that the destruction of suspected drugs as part of a field test was reasonable.  *Id.* at 125.  And, in *Segura*, citing *Place*, six justices agreed that a seizure reasonable at its inception can become unreasonable because of its duration.  *See Segura*, 468 U.S. at 812 (opinion of Burger, C.J., joined by O'Connor, J.); *id.* at 823 (Stevens, J., dissenting, joined by Brennan, Marshall, and Blackmun, J.J.).

Here, Plaintiffs, in their main argument,[2] do not contend that MPD violated their Fourth Amendment rights because the initial detention of their phones went on too long.  Rather, they concede that, at a minimum, the District of Columbia "has a legitimate interest in preventing arrestees from using their cell phones while in custody."  Compl. ¶ 81.  So, the validity of the

---

[2] As discussed below, Plaintiffs advance an alternative theory to support a Fourth Amendment violation: that MPD continued to withhold their phones long after deciding not to charge them in order to search them for evidence of crimes.  *See* Pls.' Opp'n at 14–15 (citing Compl. ¶ 27).  As discussed below, the court assumes that allegation states a plausible Fourth Amendment violation, but Plaintiffs' Complaint fails to support municipal liability against the District for that theory.

initial seizure is not in dispute.  Their primary challenge is to the failure by MPD to return their phones after "the District of Columbia had no further legitimate interest in the continued retention of the cell phones."  *Id.*  As discussed, every Circuit has held that the Fourth Amendment does not protect against the prolonged retention of lawfully seized property.  Plaintiffs have not cited a single case that says otherwise.

Plaintiffs also insist that the out-of-Circuit precedent is flawed because some of the cases purportedly conflict with other decisions within their Circuit.  Pls.' Opp'n at 11–13.  Plaintiffs misread the law.  The authorities cited by Plaintiffs largely involve application of the rule articulated in *Place* concerning the manner of executing a search of seized property; they do not address whether the Fourth Amendment has anything to say about its prolonged retention.  So, for example, in *United States v. Smith*, the Second Circuit concluded that a 31-day delay between law enforcement's initial seizure of the defendant's tablet computer and its "*seeking a search warrant . . . was unreasonable under the Fourth Amendment.*"  967 F.3d 198, 211 (2d. Cir. 2020) (emphasis added).  Plaintiffs also cite two other Second Circuit cases, *Krimstock v. Kelly* and *United States v. Martin*, but they too are inapposite.  The court in *Krimstock* held that the Fourth Amendment *does not* require a "full-dress adversarial hearing . . . to review a prosecutor's unilateral determination that a vehicle is needed as potential evidence, and that district attorneys must be permitted to seek retention orders *ex parte* so that defendants cannot use the hearings for discovery or to restrict the prosecution's theories at trial."  *Krimstock*, 464 F.3d 246, 253 (2d Cir. 2006).  And *Martin* involved the question of whether the police acted unreasonably in waiting 11 days to secure a search warrant.  *Martin*, 157 F.3d 46, 54 (2d Cir. 1998).  Plaintiffs also cite to the First Circuit's decision in *United States v. Veillette*, 778 F.2d 899 (1st Cir. 1985).  Pls.' Opp'n at 12.  But there the First Circuit deemed reasonable a two-day delay in securing a warrant to

search a marijuana stash house over the Fourth of July holiday weekend.  *Veillette*, 778 F.2d at

903.  And Plaintiffs' attempts to undermine the Sixth Circuit's decision in *Fox* and the Seventh

Circuit's *Lee* decision likewise involve cases that evaluate the reasonableness of the time taken by

law enforcement to secure a search warrant.  Pls.' Opp'n at 13 (citing *Moya v. United States*, 761

F.2d 322, 325 n.1 (7th Cir. 1984); *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993)).

Plaintiffs also make much of then-Judge Gorsuch's decision in *United States v. Christie*,

highlighting the following question that he posed:

> What, after all, is "reasonable" about police seizing an individual's property on the
> ground that it potentially contains relevant evidence and then simply neglecting for
> months or years to search that property to determine whether it really does hold
> relevant evidence needed for trial or is totally irrelevant to the investigation and
> should be returned to its rightful owner?

717 F.3d 1156, 1162 (10th Cir. 2013).  But the opinion's very next sentence shows why that

question is not pertinent here: "In assessing the reasonableness of a *delay in seeking a warrant*,

however, we must take account of 'the totality of the circumstances' in each case as it comes to

us." *Id.* (emphasis added).  As already discussed, the unreasonable delay cases are not controlling

here.

In the end, Plaintiffs fail to overcome the unanimous chorus of cases holding that the Fourth

Amendment does not speak to prolonged delays in returning lawfully seized property.  Only the

Fifth Amendment provides a constitutional hook.  *Shaul*, 363 F.3d at 187.  The court will turn to

Plaintiffs' Fifth Amendment challenge (Count II) after taking up their alternative Fourth

Amendment claim.

### 3.    *Plaintiffs' Challenge to Unreasonable Delay Before Search*

In paragraph 27 of their Complaint, Plaintiffs allege that 13 days after their arrests an MPD

detective at last responded to their counsel's repeated inquiries seeking return of their cell phones.

The detective wrote in an email that "[m]embers of the Criminal Investigations Division are actively investigating this incident.  Evidence recovered from this incident, which may or may not include cell phones, [is] being reviewed and as such Search Warrants may be presented to the United States Attorney's Office."  Compl. ¶ 27.  Plaintiffs read this email to mean that "[t]he sole justification MPD offered for its prolonged retention of Plaintiffs' phones was its need to determine whether to pursue a warrant to search them."  Pls.' Opp'n at 15.  This, they contend, is "precisely the type of delay that the District implies the Fourth Amendment precludes."  *Id.*  At the motion to dismiss stage, the court reads the email as Plaintiffs do, despite its ambiguity (the seized evidence "may or may not include cell phones").  Also, for present purposes, the court assumes that a 13-day wait (or perhaps here even longer) in obtaining a search warrant states a Fourth Amendment violation.  Still, Plaintiffs' Section 1983 claim fails *against the District* because they have not adequately pleaded facts to support municipal liability.

There are multiple ways in which a plaintiff can show that a municipal "policy" was the "moving force" behind a constitutional violation.  *See Baker*, 326 F.3d at 1306–07.  The one selected by Plaintiffs here, *see* Compl. ¶ 86, is to demonstrate that "a series of decisions by a subordinate official manifested as a 'custom or usage' of which [a] supervisor must have been aware."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *see also Baker*, 326 F.3d at 1306 (citing "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom'" as a way of setting municipal policy).  In such a case, "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official."  *City of St. Louis*, 485 U.S. at 130.  The parties dispute the degree of similarity between events that is required to make out a plausible custom at the pleadings stage.  *See* Def.'s Mem. at 11 (urging that "[t]he past events

purportedly establishing a custom must be identical to the alleged wrongdoing underlying plaintiffs' claim"); Pls.' Opp'n at 20 (insisting that past incidents of "very similar" conduct is enough).  But the court need not resolve that dispute:  none of the examples Plaintiffs cite plausibly establish that the District has a custom of retaining arrestees' cell phones for prolonged periods for the purpose of deciding whether to seek a warrant to search the devices.

To plead custom, Plaintiffs identify eight different incidents encompassing "at least 208 instances of unreasonably protracted seizures of cell phones (and in one case, an iPad)."  Pls.' Opp'n at 18.  The bulk of these seizures are tied to the arrest of 200-plus demonstrators in January 2017 during the presidential inauguration.  Compl. ¶ 53(a).  Some arrestees were charged, others were not, but "the government did not return the[ir] phones for at least eight months (and in some cases much longer)."[3]  *Id.*  Other incidents include (1) the failure to return a cell phone and iPad in 2018 while a putative class member was "posting fliers in downtown Washington, D.C." as part of "a progressive organizing campaign," *id.* ¶ 53(b); (2) an 11-month delay in returning the seized phone and other property of a photojournalist while he was covering another racial justice protest in the summer of 2020, *id.* ¶ 53(c); (3) the prolonged retention of cell phones of six others, including two robbery suspects, a theft suspect, an individual charged with unauthorized use of a vehicle, another individual who was "no-papered," and a final person against whom charges were dismissed, *id.* ¶ 53(d)–(i).  Plaintiffs allege that, in each of these instances, the seized phones "had no evidentiary value," were "not introduced as evidence," or were wholly "unrelated" to the charged crimes at issue.  *See id.* ¶ 53(d)–(g).

---

[3] MPD later allowed some of these individuals to "look through a large plastic bin full of seized cell phones" in its Evidence Control Branch.  *Id.* ¶ 53(a)(i).  Most memorably, one demonstrator could not find the phone MPD seized from her at the 2017 inauguration protests, but she did find another one of her phones "seized from her at another demonstration several years prior."  *Id.* ¶ 53(a)(ii).  MPD did not allow her to recover it.  *Id.*

To establish municipal liability by "custom," Plaintiffs must plausibly allege that the "moving force" behind the violation of their Fourth Amendment rights was MPD's persistent practice of taking weeks (if not months) to decide whether to secure search warrants for cell phones seized at the time of arrest. *See Baker*, 326 F.3d at 1306. Yet in none of the other cases identified by Plaintiffs is the "unreasonably protracted seizure" alleged to have occurred due to MPD's lack of diligence in pursuing a search warrant. Indeed, it is equally plausible (if not more so) that MPD's failure to timely give owners back their seized phones is the result of simple negligence, and not a conscious or reckless disregard of constitutional rights. Plaintiffs' alternative Fourth Amendment theory therefore fails to plead plausible grounds for attaching municipal liability to the District.

### B. Fifth Amendment Claim (Count II)

Plaintiffs' Fifth Amendment claim rests on the alleged absence of an adequate process "for arrestees to regain seized cell phones when no charges were filed against them and when there is no pending case in which the phones could serve as evidence." Pls.' Opp'n at 24. Plaintiffs recognize that, at least on its face, D.C. Superior Court Rule of Criminal Procedure 41(g) would appear to supply a remedy. Like its federal analog, *see* FED. R. CRIM. P. 41(g), the Superior Court rule provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." D.C. SUPER. CT. R. CRIM. P. 41(g). Plaintiffs are "person[s] aggrieved" by "the deprivation of property," so they "may move for the property's return" under the rule. By its plain terms then, Plaintiffs could have tried to get their cell phones back by invoking Rule 41(g) in Superior Court. *Cf. United States v. Thorne*, 548 F. Supp. 3d 70, 117 (D.D.C. 2021) ("[I]n interpreting any of the [Federal] Rules [of Criminal

14

Procedure], courts must begin with the text." (internal quotation marks omitted)).  In fact, some of them successfully did just that.  Compl. ¶¶ 36–39.

Still, Plaintiffs maintain that the process Rule 41(g) offers is insufficient.  They contend that "where no charges against the property owner were filed, and no criminal case in which the property could serve as evidence is pending, the Superior Court has no jurisdiction to hear a Rule 41(g) motion."  Pls.' Opp'n at 23.  Plaintiffs further insist that, "even if there were some novel basis under which the Superior Court could have jurisdiction to hear Plaintiffs' Rule 41(g) motions, the process would remain too burdensome and the remedy too speculative to satisfy due process." *Id.* at 23–24.  The court rejects both arguments.

1.   *Rule 41(g) Provides a Process by Which to Recover Retained Property*

Strictly speaking, the D.C. Court of Appeals has not had occasion to interpret Rule 41(g) in the present context, but there can be little doubt the court would find it applicable.  Tracing the court's treatment of the rule shows why.  In 1976, the D.C. Circuit in *United States v. Luther Wilson* held that "the district court has both the jurisdiction and duty to return" property seized once criminal proceedings have terminated and the property is no longer needed for a criminal prosecution.  540 F.2d 1100, 1103 (D.C. Cir. 1976).  Four years later, in *Robert Wilson v. United States*, the D.C. Court of Appeals citing *Luther Wilson* and other federal cases "adopt[ed] the position that the Superior Court has jurisdiction after a criminal trial to rule on a motion to return property which had been seized in connection with the prosecution."  424 A.2d 130, 132 (D.C. 1980).   Then, three years later, in *Alleyne v. United States*, the D.C. Court of Appeals applied *Robert Wilson* to a case in which the government had "no papered" the plaintiff's criminal case. 455 A.2d 887, 888 (D.C. 1983).  The court recognized that "[i]t is true that in the post-conviction context the judge has heard all the facts pertinent to issues involved in property return motions,

whereas he has not had such an opportunity when the case is disposed of by *nolle prosequi*." *Id.*
at 889.  "That should be no bar, however, to taking jurisdiction over a motion where no trial has
occurred.  It is a simple enough matter for a judge to hold a hearing at whatever stage the motion
is brought, eliciting the facts as would be done at trial." *Id.*  The *Alleyne* court emphasized that
the Superior Court had jurisdiction to consider a return-of-property motion separate and apart from
a motion brought under the MPD property clerk statute.[4]  "We take this opportunity to reiterate
what we held in [*Robert*] *Wilson*: the property clerk statute neither was intended, nor does it in
effect, divest the Superior Court of jurisdiction to entertain a motion for return of property." *Id.*
More recently, in *District of Columbia v. Dunmore*, the court observed that its decision in *Robert
Wilson* had found the D.C. Circuit's "analysis of the corresponding federal Rule 41 authority" in
*Luther Wilson* to be "particularly persuasive."  749 A.2d 740, 743 (D.C. 2000) (quoting *Robert
Wilson*, 424 A.2d at 132 n.4).

        Taken together, these cases make clear that, if squarely confronted with the question, the
D.C. Court of Appeals would read Rule 41(g) to reach the Plaintiffs' circumstances.  *Alleyne*, in
particular, makes clear that the Superior Court has jurisdiction to hear motions for return of
property even when a case, as here, is no papered.  That *Alleyne* did not expressly rely on a court
rule only strengthens the conclusion that the Court of Appeals would read an actual rule—Rule
41(g)—to authorize the Superior Court to hear motions for return of property by persons, like these
Plaintiffs, who were arrested but not charged.  *Alleyne* thus refutes Plaintiffs' contention that "the
Superior Court has no jurisdiction to hear a Rule 41(g) motion."  Pls.' Opp'n at 23.

        Plaintiffs attempt to distinguish *Alleyne* on the grounds that, although the defendants' cases
there were "no papered," they were "charged" with a crime, which was then dismissed at

---

[4] The present-day version of the property clerk statute is codified at D.C. Code § 5-119.06.

arraignment.  *Id.* at 25.  But *Alleyne* likely presents no factual distinction.  It is true that the court there said the defendants "were arrested and charged" with a narcotics offense.  455 A.2d at 888. However, the case history also states that the charged offense was a "misdemeanor" and that, "[e]xercising its prosecutorial discretion, the government disposed of the cases by *nolle prosequi* at arraignment later *the same day*."  *Id.* (emphasis added).  Thus, when the court spoke of being "arrested and charged," it likely meant "charged" by the police in the context of an initial arrest rather than by prosecutors.  It seems unlikely that prosecutors would both charge and drop charges on the very same day.  And, even if *Alleyne* could be read to suggest that the defendants there were formally charged and had those charges dismissed the very same day, it is doubtful that the D.C. Court of Appeals would view that factual distinction as cabining Rule 41(g) in the manner suggested by Plaintiffs.

Federal cases interpreting the federal equivalent of the rule, which the D.C. Court of Appeals has said are "particularly persuasive," only confirm the court's conclusion.  *Dunmore*, 749 A.2d at 743 (quoting *Robert Wilson*, 424 A.2d at 132 n.4); *see also Demus v. United States*, 710 A.2d 858, 859 (D.C. 1998) ("Because our rule is identical to the federal rule we look with favor on the federal authorities where we have no clear precedent in this court."); *Marshal v. United States*, 145 A.3d 1014, 1017 (D.C. 2016) (construing D.C. Superior Court criminal rule in light of its federal analog).  Federal courts have found that a person filing a Rule 41(g) motion need not be a party to an existing criminal matter.  In *Harbor Healthcare System, L.P. v. United States*, the Fifth Circuit found that Rule 41(g) provided a means preindictment to recoup privileged documents from the government.  5 F.4th 593, 600 (5th Cir. 2021); *see also id.* at 598 n.2 ("Here, however, [the movant] is not involved in any pending case—civil or criminal—other than its Rule 41(g) civil case, in which return of [the movant's] property is the single dispositive issue.").  The

court rejected the government's efforts to shunt the movant to the criminal process. "A motion to suppress in a possible criminal proceeding" failed to offer similar relief because "it is not certain that there ever will be criminal charges brought" and, even if successful, "suppression does not force the government to return those materials to the criminal defendant." *Id.* at 600. Rule 41(g), on the other hand, "is concerned solely with the return of property to the . . . movant." *Id.* The Ninth Circuit, sitting en banc in *United States v. Comprehensive Drug Testing, Inc.*, also approved the use of Rule 41(g) "by a party against whom no criminal charges have been brought." 621 F.3d 1162, 1172 (9th Cir. 2010) (en banc), *overruled in part on other grounds as recognized by United States v. Caro*, 934 F.3d 1002, 1019 n.11 (9th Cir. 2019). These motions are properly filed as an "independent civil case." *Harbor Healthcare Sys.*, 5 F. 4th at 598 n.2.

Additionally, federal courts have said that the power to hear a Rule 41(g) motion brought by a person who is not a party to an existing action rests on a court's "equitable jurisdiction." *Comprehensive Drug Testing, Inc.*, 621 F.3d at 1172; *see also Klitzman, Klitzman & Gallager v. Krut*, 591 F. Supp. 258, 266 (D.N.J. 1984) ("Where, as here, plaintiff institutes an independent [Rule 41(g)] action for such return, there is no question but that courts may utilize their equitable power to order pre-indictment relief."), *aff'd*, 744 F.2d 955 (3d Cir. 1984). Plaintiffs cast doubt on the availability of equitable jurisdiction, contending that it "rests on a conception of jurisdiction that has rarely been invoked . . . and its very existence has been questioned." Pls.' Opp'n at 26–27 (citing *In re Grand Jury Proc.*, 115 F.3d 1240, 1246 (5th Cir. 1997) (internal quotation marks omitted)). The primary case that Plaintiffs cite—*In re Grand Jury Proceedings* from the Fifth Circuit—did not question the existence of equitable power of a federal court to return records under Rule 41(g).[5] Rather, it held that equitable jurisdiction[6] could not be used to justify a court's

---

[5] *In re Grand Jury Proceedings*, decided in 1997, concerned then-Rule 41(e), which is now found in Rule 41(g).
[6] The Fifth Circuit called it "anomalous jurisdiction." *In re Grand Jury Proc.*, 115 F.3d at 1244, 1246.

*preindictment* order to unseal a search warrant affidavit on the threat that the failure to do so would result in suppression of evidence. *See In re Grand Jury Proc.*, 115 F.3d at 1244, 1246. In fact, one of the reasons that the court declined to invoke its equitable jurisdiction in that case was because the movants had "an adequate remedy at law" under Rule 41(g) and they had "failed to avail themselves of the preindictment remedy provided by" it. *Id.* at 1247. The other case that Plaintiffs cite to suggest the need for "caution and restraint" in the exercise of equitable jurisdiction is *In re Singh*, 892 F. Supp. 1 (D.D.C. 1995), but there the court *did* exercise equitable jurisdiction to entertain a Rule 41(g) motion. *See id.* at 3–4. The court is confident that the D.C. Court of Appeals would apply Rule 41(g) to Plaintiffs' scenario.

Plaintiffs' counterarguments are unpersuasive. Citing to *Dunmore*, Plaintiffs argue that the "purpose of the Rule . . . is to promote 'economy of judicial effort' by allowing the same judge who presides over the criminal case to adjudicate the related issue of whether the government must release property seized in relation to that case." Pls.' Opp'n at 24 (citing *Dunmore*, 749 A.2d at 743); *see also id.* at 25 (asserting that *Dunmore* placed "careful limits on the Superior Court's Rule 41(g) jurisdiction"). The court in *Dunmore* did use the phrase "economy of judicial effort" to describe the circumstances in which its previous cases had affirmed "the 'jurisdiction and duty' of the trial court to return property under Rule 41(g)." 749 A.2d at 743 (citing *Luther Wilson*, 540 F.2d at 1104). Those prior decisions, however, included *Alleyne*, which is factually on all fours with this case. *See id.* at 742 (citing *Alleyne*). Nothing in *Dunmore* limits the reach of Rule 41(g) in the way that Plaintiffs propose.

Plaintiffs argue, too, that Rule 41(g) "remains constitutionally insufficient because its availability in practice is entirely uncertain," and the District has "cited no cases in which the D.C. Court of Appeals has held that individuals in Plaintiffs' circumstances can invoke the rule."

Pls.' Opp'n at 26.   Putting aside the fact that this argument improperly puts the burden on the District, that assertion ignores both the force of *Alleyne* and the fact that the D.C. Court of Appeals "construe[s] rules that are substantially identical to the corresponding federal rule in light of the meaning given to the federal rule." *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543 (D.C. 2011).   Plaintiffs offer no valid reason why the D.C. Court of Appeals would not read Rule 41(g) to reach demands by an uncharged arrestee for the return of seized property.

The best authority Plaintiffs summon is *Avila v. Dailey*, where the court ruled that "[b]ecause Plaintiff was not a defendant in a criminal proceeding, nor was there any criminal proceeding at all, Rule 41(g) did not provide him with an adequate remedy for the seizure of his van." 246 F. Supp. 3d 347, 363 (D.D.C. 2017).   But *Avila* is factually different than this case in one respect: Avila's van was seized with a search warrant, but he was never arrested.   *See id.* at 350–51.   Here, the seizure was pursuant to an arrest and the case was no papered, so there was "some criminal proceeding."

That said, the court thinks that factual distinction is beside the point.   The *Avila* court cited *Dunmore* for the proposition that Rule 41(g) motions are "ancillary to the criminal proceeding in which it is brought."   *Id.* at 363 (internal quotation marks omitted) (citing *Dunmore*, 749 A.2d at 742).   But *Dunmore*'s reference to Rule 41(g) as "ancillary to a criminal proceeding" came from *Stevens v. United States*, 462 A.2d 1137 (D.C. 1983).   *Stevens* described Rule 41(g) as "ancillary" in the context of a matter in which the property already had been returned to the victim of the alleged offense before the filing of the Rule 41(g) motion (Stevens was acquitted at trial).   *See id.* at 1138 ("We are persuaded that in a case where the property has been returned to a person other than the accused before trial, it is inappropriate for the trial court to entertain a motion for return of property ancillary to the criminal proceeding.").   The court held that the use of Rule 41(g) was

improper in that circumstance because it would require the trial court to effectively adjudicate a civil dispute "rather than simply ordering a return of property." *Id.* at 1139.  A Rule 41(g) motion filed by these Plaintiffs would not be "ancillary" in the sense used by *Stevens*.

The *Avila* court also was persuaded by a prior decision in this District stating that Rule 41(g) allows a plaintiff to "move in the Superior Court for the return of property seized as part of a criminal action."  *Avila*, 246 F. Supp. 3d at 363 (citing *Cousart v. Metro Transit Police Chief*, 101 F. Supp. 3d 27, 29 (D.D.C. 2015)).  That case, however, involved a decision where the court dismissed a pro se complaint for failure to oppose the defendant's motion to dismiss.  *Cousart*, 101 F. Supp. 3d at 29.  In doing so, the court advised the plaintiff that "[a]ll hope is not lost" and directed him to the possibility of filing a Rule 41(g) motion in Superior Court "for the return of property seized as part of a criminal action."  *Id.*  But the court added, citing *Alleyne*, that the "D.C. Superior Court also has jurisdiction to hear a civil action for the return of property seized in a case that was 'disposed of by *nolle prosequi*.'"  *Id.* (citing *Alleyne*, 455 A.2d at 888–89).  Nothing in *Cousart* says that Rule 41(g) is available only to persons who were the subject of a filed criminal proceeding.  These Plaintiffs have a remedy for return of property in Rule 41(g).

Finding that Rule 41(g) provides Plaintiffs *a* process does not answer whether the Rule itself satisfies constitutional minimum requirements.  The court turns to that question next.

### 2.   *Constitutional Adequacy of Rule 41(g)*

Procedural due process claims are analyzed using one of two frameworks.  Under *Mathews v. Eldridge*, courts evaluate (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail."  424 U.S. 319, 335 (1976).

Under *Medina v. California*, a rule of criminal procedure does not run afoul of "the Due Process

Clause unless it offends some principle of justice so rooted in the traditions and conscience of our

people as to be ranked as fundamental . . . . [or] transgresses any recognized principle of

fundamental fairness in operation."  505 U.S. 437, 445, 448 (1992) (internal quotation marks

omitted).   Plaintiffs urge the court to select the *Mathews* balancing test, Pls.' Opp'n at 29, while

the District presses *Medina*, Def.'s Mem. at 16.  The court agrees with Plaintiffs that *Mathews*

governs, but it ultimately finds that Rule 41(g) satisfies procedural due process requirements.

a.　　Selection of *Mathews*

Supreme Court precedent requires using the *Mathews* test.  While Rule 41(g) is found in

the Superior Court's Rules of Criminal Procedure, and *Medina* by its own terms applies to "state

procedural rules which . . . are part of the criminal process," 505 U.S. at 443, the Supreme Court

has recently underscored that it understands "criminal process" to constitute something less than

the entirety of the book of criminal procedure.  In *Nelson v. Colorado*, the Supreme Court limited

the phrase to those rules typically concerning "the allocation of burdens of proof and the type of

evidence qualifying as admissible."  137 S. Ct. 1249, 1255 (2017).  The *Nelson* Court instead

selected *Mathews* to govern the plaintiffs' challenges to "the continuing deprivation of property

after a conviction has been reversed or vacated, with no prospect of reprosecution."  *Id.*  In so

doing, it expressly adopted the dissent of Chief Justice Roberts in *Kaley v. United States*, where

he argued that courts should look to *Mathews* when evaluating "the collateral issue of the pretrial

deprivation of property."  *Id.* (citing *Kaley v. United States*, 571 U.S. 320, 350 n.4 (2014) (Roberts,

C.J., dissenting)).

22

The District tries to avoid the application of *Mathews* by arguing that *Nelson* and *Kaley* are factually inapposite.  Def.'s Reply in Supp. of Def.'s Mot., ECF No. 23, [hereinafter Def.'s Reply], at 15–16.  "Neither [case] dealt with a claim for the return of property seized in connection with a felony arrest or during an active criminal investigation."  *Id.* at 16.  That is true.  *Nelson* concerned the procedural sufficiency of a state statue enabling defendants whose convictions had been invalidated to recover fees, costs, and restitution assessed by the sentencing court, 137 S. Ct. at 1255, and *Kaley* concerned the adequacy of the federal court process for challenging the pre-trial seizure of assets, 571 U.S. at 335.  But these factual distinctions are not enough to avoid application of *Mathews* to Rule 41(g).

A court in this District already has concluded that D.C. Superior Court Rule 41(g) offers a constitutionally adequate post-seizure mechanism to challenge the seizure of property.  *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 32 (D.D.C. 2019).  Applying the *Mathews* factors, the court held in the context of unregistered guns and ammunition seized incident to arrest, "the post-deprivation hearing Rule 41(g) makes available satisfies the Fifth Amendment's procedural due process guarantee."  *Id.*  This court agrees with that conclusion.

        b.    <u>Applying *Mathews*</u>

The District rightly concedes that the first *Mathews* factor, which considers "the owner's interest in the property," weighs in favor of Plaintiffs.  Def.'s Mem. at 18; *see Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018) (detailing how a cell phone is "almost a feature of human anatomy" in that it "tracks nearly exactly the movements of its owner" and "faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales" internal quotation marks omitted)).

The second *Mathews* factor directs courts to consider "the risk of an erroneous deprivation of such interest through the procedures used," and how much improvement, if any, "additional or substitute procedural safeguards" might offer.  424 U.S. at 335.  Plaintiffs claim they are seeking "a hearing, which, unlike the one established by Rule 41(g), is actually available to individuals in [their] circumstances."  Pls.' Opp'n at 30.  But as the court has explained, *see supra* at 15–21, Rule 41(g) *is* available to Plaintiffs here.  Rule 41(g) says that the court "*must* receive evidence on any factual issue necessary to decide the motion."  D.C. SUPER. CT. R. CRIM. P. 41(g) (emphasis added).  Given this requirement, the "risk of an erroneous deprivation" is negligible.  Nevertheless, Plaintiffs fault MPD officers for failing to "conduct individualized probable cause determinations before deciding to retain individuals' phones" pursuant to MPD policy.  Pls.' Opp'n at 30.  So, Plaintiffs seek the additional safeguard of "a prompt hearing on the legality of the retention before a neutral decisionmaker."  *Id.* at 31.  Rule 41(g) already opens the courthouse doors to Plaintiffs, so the only added safeguard proposed here concerns timeliness.  Ensuring the timely return of a seized cell phone in which the government no longer has an evidentiary interest is not insubstantial.  But Rule 41(g) does not require a person to wait a minimum amount of time before seeking the return of seized property.  Plaintiffs here could have filed Rule 41(g) motions soon after their efforts at securing release from MPD were frustrated.  When they eventually did so, their filings were accepted.  *Id.* ¶ 34 (stating their motions were accepted as a sealed, standalone criminal case for administrative purposes).  Plaintiffs say their treatment in Superior Court was "ad hoc," *id.* ¶ 35, but that does not mean that any substitute or additional safeguards are necessary.  Greater clarity in the process will do.  The court finds that the second *Mathews* factor favors the District.

The third *Mathews* factor weighs conclusively in favor of the District. This factor considers "the Government's interest, including the . . . fiscal and administrative burdens" created by the plaintiff's sought-after substitute process. *Mathews*, 424 U.S. at 335. The District asserts Plaintiffs are essentially demanding "an automatic Rule 41(g)-like hearing" for every individual "before criminal charges are filed." Def.'s Reply at 17. This would require the District to defend the continued retention of property, including during "a pending criminal investigation, unless it had filed charges." *Id.* This would significantly interfere with ongoing investigations and would force the government to routinely explain to courts why it continues to retain seized property. The Constitution does not demand such a burdensome process.

In sum, two of the three *Mathews* factors weigh in favor of the District, and together they outweigh Plaintiffs' possessory interests in their cell phones. Rule 41(g) therefore satisfies the due process guarantee of the Fifth Amendment. Count II will be dismissed.

### C.    D.C. Common Law Conversion (Count III)

Plaintiffs' sole remaining count is for conversion under D.C. law. Compl. ¶¶ 92–96. Plaintiffs invoke supplemental jurisdiction under 28 U.S.C. § 1367 for the claim. *Id.* ¶ 11. The District argues for dismissal on the merits, Def.'s Mem. at 19–20, but the court need not reach them because it declines to exercise supplemental jurisdiction.

Section 1367 grants federal courts supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The statute also provides that "district courts may decline to exercise supplemental jurisdiction over a claim if," among other reasons, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). That is precisely the case here. There is no claim

left except Plaintiffs' common law tort.  Accordingly, the court will dismiss the conversion claim, too.  *See Fin. Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 777–78 (D.C. Cir. 1982) (observing pre-enactment of § 1367 that "[i]f the federal claims have been resolved at an early stage in the litigation, leaving state claims to the state courts will not necessarily require a wasteful duplication of effort, and a state court will provide a more accurate, authoritative determination of the applicable law"); *see also Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (stating "that in the usual case in which all federal-law claims are dismissed before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims") (internal quotation marks and alterations omitted) (citing *Shekoyan v. Sibley* Int'l, 409 F.3d 414, 424 (D.C. Cir. 2005)).

### D.      Motion for Class Certification

Because the court grants Defendant's motion to dismiss, it also denies Plaintiffs' motion for class certification as moot.

## V.      CONCLUSION

For the reasons set forth above, the court grants Defendant's Motion to Dismiss, ECF No. 19, and denies Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, ECF No. 9.  A separate final appealable Order accompanies this Memorandum Opinion.

Dated:  August 29, 2022

Amit P. Mehta
United States District Judge